# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 22, 2022

Lyle W. Cayce
Clerk

No. 21-30278

Q Clothier New Orleans, L.L.C.; Q Shirtmakers West Village, L.L.C.; Q Custom Clothier Houston, L.L.C.; Q Custom Clothier OKC, L.L.C.; Q Custom Clothier ATL, L.L.C.; Q Clothier Tulsa, L.L.C.; Q Clothier Fort Worth, L.L.C.; Q Fifty One Digital, L.L.C.; Q Fifty One, L.L.C.,

*Plaintiffs—Appellants*,

*versus*

Twin City Fire Insurance Company,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:20-CV-1470

Before King, Graves, and Ho, *Circuit Judges*.

James E. Graves, Jr., *Circuit Judge*:

In response to the onset of the COVID-19 pandemic, state and local authorities across the country ordered nonessential businesses to close or suspend operations. Louisiana and the City of New Orleans did the same. Q Clothier complied with the orders and closed its men's clothing stores. After losing business income as a result, Q Clothier submitted claims to its insurer under two types of provisions: one covering "direct physical loss of

No. 21-30278

or damage to property" and the other covering the loss of business income when access to the store is prohibited by a civil authority order "as a direct result of" a covered loss of property. The insurer denied the claims.

Q Clothier sued the insurer and sought coverage for its business income losses. The district court granted the insurer's motion for judgment on the pleadings after concluding the orders closing nonessential businesses did not qualify as a direct physical loss of or damage to property and no other coverage applied. We agree with these conclusions and AFFIRM.

## I.   BACKGROUND

Plaintiffs-Appellants Q Clothier own and operate nine high quality men's clothing stores in four states.[1] Q Clothier purchased an insurance policy from Defendant-Appellee Twin City Fire Insurance Company to cover each of the stores. The policy was in effect from June 19, 2019 through June 19, 2020.

The policy provides coverage for Q Clothier's business and business property caused by covered causes of loss. For coverage, the policy states Twin City "will pay for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations . . . caused by or resulting from a Covered Cause of Loss." "Covered Causes of Loss" are defined as "risks of direct physical loss" unless excluded or limited by the policy.

The policy has a couple of relevant coverage extensions. The Business Income Extension states Twin City

---

[1] Plaintiffs-Appellants are a collective of nine limited liability companies operating stores in Louisiana, Texas, Oklahoma, and Georgia. We refer to them collectively as "Q Clothier."

No. 21-30278

> will pay for the actual loss of Business Income [Q Clothier]
> sustain[s] due to the necessary suspension of [Q Clothier's]
> 'operations' during the 'period of restoration.' The
> suspension must be caused by direct physical loss of or physical
> damage to property at the 'scheduled premises,' . . . caused by
> or resulting from a Covered Cause of Loss.

The Civil Authority Extension covers "the actual loss of Business Income [Q Clothier] sustain[s] when access to [the] 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of [the] 'scheduled premises.'"

The policy also has a "Virus Exclusion." It states Twin City "will not pay for loss or damage caused directly or indirectly by" "[p]resence, growth, proliferation, spread or any activity of 'fungi,' wet rot, dry rot, bacteria or virus. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."

The Virus Exclusion has one relevant exception which states the Exclusion does not apply when the "Additional Coverage – Limited Coverage for 'Fungi,' Wet Rot, Dry Rot, Bacteria and Virus" provides coverage. This "Limited Virus Coverage" "*only applies* when the . . . virus is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence." (emphasis added). The causes listed are (1) a "specified cause of loss" other than fire or lightning or (2) equipment breakdown or accident. A "specified cause of loss" is defined in the policy as "fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse;

No. 21-30278

volcanic action; falling objects; weight of snow; ice or sleet; water damage." When Limited Virus Coverage applies, the policy states Twin City "will pay for loss or damage by 'fungi,' wet rot, dry rot, bacteria and virus." "[L]oss or damage means [d]irect physical loss or direct physical damage . . . ."

The Limited Virus Coverage concludes with subsection (B)(1)(f), which states:

> The following applies only if a Time Element Coverage applies to the "scheduled premises" and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Time Element Coverage.
>
> > (1) If the loss which resulted in "fungi", wet rot, dry rot, bacteria or virus does not in itself necessitate a suspension of 'operations', but such suspension is necessary due to loss or damage to property caused by "fungi", wet rot, dry rot, bacteria or virus, then our payment under the Time Element Coverage is limited to the amount of loss and expense sustained in a period of not more than 30 days unless other number of days is indicated in the Declarations . . . .

In March 2020, the COVID-19 pandemic caused state and local authorities to issue orders restricting personal and business activities to prevent the spread of the virus. In Louisiana, the Governor issued a series of proclamations directing certain nonessential businesses to close completely or reduce operations. The Mayor of New Orleans also directed certain

4

No. 21-30278

businesses to cease operations. Q Clothier complied with these orders, closed its stores, and lost business income.[2]

Q Clothier then filed a claim with Twin City to recover its losses under the policy. Twin City denied coverage and stated "[e]ven if the virus did cause damage, it is excluded from the policy, and the limited coverage available for losses caused by virus does not apply to the facts of [Q Clothier's] loss." Twin City also denied coverage under the Civil Authority Extension because there was no indication that "a civil authority issued an order as a direct result of a covered cause of loss to property in the immediate area of [Q Clothier's] scheduled premises."

Q Clothier sued Twin City in federal court in the Eastern District of Louisiana seeking coverage for its losses under the policy. Twin City moved for judgment on the pleadings. The district court granted Twin City's motion. The district court applied Louisiana law and concluded (1) Q Clothier did not allege it was entitled to coverage because it failed to allege a direct physical loss of or damage to property, (2) the Virus Exclusion applied, (3) the Limited Virus Coverage did not apply, (4) the Civil Authority Extension did not apply, and (5) the "Time Element Coverage" in subsection (B)(1)(f) was not an independent basis of coverage. Q Clothier timely appeals.

## II.   APPLICABLE LAW

The court reviews de novo a district court's ruling on a Rule 12(c) motion for judgment on the pleadings. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). The standard for deciding a Rule 12(c) motion is the same standard used for deciding motions to dismiss pursuant

---

[2] Although Q Clothier has stores in many states, it only alleges it closed its stores in response to the orders from the Governor of Louisiana and Mayor of New Orleans.

to Rule 12(b)(6). *See id.* The court must accept the well-pleaded facts as true and view them in the light most favorable to the plaintiff. *See Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007).

The parties do not dispute that Louisiana law governs the policy. "An insurance policy is a conventional obligation that constitutes the law between the insured and the insurer, and the agreement governs the nature of their relationship." *Supreme Servs. & Spec. Co. v. Sonny Greer, Inc.*, 958 So. 2d 634, 638 (La. 2007) (citing La. Civ. Code Ann. art. 1983). Insurance policies are therefore interpreted by the same principles as contract interpretation. *See id.*; *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 588–89 (La. 2007).

Courts must first consider the parties' intent by examining the words of the policy. *See Sims*, 956 So. 2d at 589; La. Civ. Code Ann. art. 2045–46. In so doing, "words and phrases in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning, in which case the words must be ascribed their technical meaning." *Sims*, 956 So. 2d at 589 (citing La. Civ. Code Ann. art. 2047). "When the words of an insurance contract are clear and unambiguous and lead to no absurd consequences, courts must enforce the contract as written and may make no further interpretation in search of the parties' intent." *Gorman v. City of Opelousas*, 148 So. 3d 888, 892 (La. 2014) (citation omitted); La. Civ. Code Ann. art. 2046.

An insurance policy must be construed as a whole and each provision must be interpreted to give meaning to each provision. *See Peterson v. Schimek*, 729 So. 2d 1024, 1029 (La. 1999). "One portion of the policy should not be construed separately at the expense of disregarding other provisions." *Id.* (citing La. Civ. Code Ann. art. 2050).

No. 21-30278

After applying these general rules of interpretation, if a true ambiguity exists in the policy language, the court must construe the policy in favor of the insured. *See Bonin v. Westport Ins. Corp.*, 930 So. 2d 906, 911 (La. 2006). A policy provision is ambiguous if it "is susceptible to two or more reasonable interpretations." *Id.* (citing *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003)).

The policy language at issue in this case has not yet been interpreted by the Louisiana Supreme Court. *See Gulf & Miss. River Transp. Co. v. BP Oil Pipeline Co.*, 730 F.3d 484, 488 (5th Cir. 2013) ("To determine Louisiana law . . . , this Court should first look to final decisions of the Louisiana Supreme Court." (internal quotation marks and citation omitted)). Pursuant to *Erie*, the court must make an "*Erie* guess" as to how the Louisiana Supreme Court would decide the issue. *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345–46 (5th Cir. 2008).

## III.    DISCUSSION

Q Clothier's claimed losses are not covered by the policy. Each of the policy's coverages for "direct physical loss of or damage to property" does not cover business income losses caused by civil authority orders closing nonessential businesses in response to the COVID-19 pandemic. The Civil Authority Extension doesn't provide coverage because the civil authority orders were issued to mitigate the spread of COVID-19, not "as a direct result of" a covered cause of loss to nearby property. And finally, the Limited Virus and Time Element Coverages unambiguously do not apply. We therefore affirm the district court's judgment in all respects.

### A. <u>Direct Physical Loss of or Damage to Property</u>

We conclude the Louisiana Supreme Court would interpret "direct physical loss of or damage to property" to cover only tangible alterations of, injuries to, and deprivations of property. Because the mandated closure of

No. 21-30278

Q Clothier's stores is none of these, Q Clothier has failed to allege facts to trigger coverage under the policy.

The policy's general coverage, Business Income Extension, and Limited Virus Coverage, are each triggered by "direct physical loss of or damage to property." The Louisiana Supreme Court has not opined on this language, but other courts have interpreted similar language. And we find these other courts' analyses persuasive here.

In *Mangerchine v. Reaves*, a Louisiana appellate court interpreting a homeowners insurance policy stated the ordinary and generally-accepted meaning of "loss" is "destruction, ruin, or deprivation." 63 So. 3d 1049, 1056 (La. Ct. App. 2011) (internal quotation marks and citation omitted). In *Widder v. Louisiana Citizens Property Insurance Corp.*, a Louisiana appellate court determined lead contamination constituted a "direct physical loss" because the contamination rendered the insured property uninhabitable until it was gutted and remediated. *See* 82 So. 3d 294, 296 (La. Ct. App. 2011), *writ denied*, 76 So. 3d 1179 (La. 2011). Although there was no physical damage, the property was unusable or uninhabitable and therefore qualified as a direct physical loss. *See id.* And because the property was required to be removed and replaced, that fact suggested the insured had suffered a direct physical loss. *See id.*; *see also Ross v. C. Adams Const. & Design, L.L.C.*, 70 So. 3d 949, 952 (La. Ct. App. 2011) (concluding insured suffered direct physical loss even though drywall was intact and functional because the qualities of the drywall required it to be removed and replaced).

In *Trinity Industries, Inc. v. Insurance Company of North America*, this court applied Louisiana law and stated "[t]he language 'physical loss or damage' strongly implies that there was an initial satisfactory state that was changed by some external event into an unsatisfactory state—for example, the car was undamaged before the collision dented the bumper." 916 F.2d

8

267, 270–71 (5th Cir. 1990). We interpreted the language pursuant to Louisiana law, and that definition has been followed in Texas, as well. *See N. Am. Shipbuilding, Inc. v. S. Marine & Aviation Underwriting, Inc.*, 930 S.W.2d 829, 834 (Tex. App. 1996) ("The *Trinity* standards are also followed in Texas."); *Great Am. Ins. Co. of N.Y. v. Compass Well Servs., LLC*, No. 02-19-00373, 2020 WL 7393321, at *14 (Tex. App. Dec. 17, 2020).

In *Terry Black's Barbecue, L.L.C. v. State Automobile Mutual Insurance Co.*, we applied Texas law to a similar insurance policy and interpreted "physical loss of property" to mean a tangible alteration or deprivation of property. 22 F.4th 450, 458 (5th Cir. 2022). We accordingly held that losses caused by civil authority orders closing nonessential businesses in response to the COVID-19 pandemic were not covered by commercial property policies. *See id.*; *see also Aggie Investments, L.L.C. v. Cont'l Cas. Co.*, 2022 WL 257439, at *2 (5th Cir. Jan. 26, 2022) (applying *Terry Black's* and concluding intangible losses from pandemic closures did not qualify as "direct physical loss of property"). Although we applied Texas law in *Terry Black's*, we are persuaded Texas and Louisiana courts would reach the same conclusion regarding the interpretation of the language in these policies. *See, e.g.*, *Aggreko, L.L.C. v. Chartis Spec. Ins. Co.*, 942 F.3d 682, 688 (5th Cir. 2019) ("[W]e note that . . . we are unaware of[] any pertinent difference between Texas law and Louisiana law with respect to interpreting insurance policies.").

Considering this case law and the unambiguous[3] meaning of "direct physical loss of or damage to property," we conclude Q Clothier's losses are not covered by the policy's general coverage, Business Income Extension, or

---

[3] We accordingly deny Q Clothier's motion to certify the question to the Louisiana Supreme Court. Q Clothier's motion for leave to file a supplemental motion to certify the question is denied as moot.

Limited Virus Coverage. Q Clothier has only alleged a loss of business income due to its compliance with the civil authority orders directing the close of its stores. But that loss is not tangible. Nor is it an alteration, injury, or deprivation of *property*. Q Clothier's property has been unchanged by the orders or the close of its stores. Although we recognize the government orders placed limitations on the operations of businesses, those limitations did not tangibly alter Q Clothier's property or deprive Q Clothier of its property.

As we said in *Terry Black's*, this conclusion is consistent with every other circuit court to interpret this language in the context of losses caused by civil authority orders closing nonessential businesses during the COVID-19 pandemic. *See* 22 F.4th at 456–57 (citing cases); *see also Uncork & Create LLC v. Cincinnati Ins. Co.*, -- F.4th --, No. 21-1311, 2022 WL 662986, at *6 (4th Cir. Mar. 7, 2022) (concluding government-mandated business closures were not covered because they did not cause "present or impending material destruction or material harm that physically altered the covered property requiring repairs or replacement so that they could be used as intended"); *Brown Jug, Inc. v. Cincinnati Ins. Co.*, -- F.4th --, No. 21-2644, 2022 WL 538221, at *3 (6th Cir. Feb. 23, 2022) ("[A] sufficient complaint alleging that the COVID-19 virus itself damaged an insured property would likely, at a minimum: (1) include allegations that COVID-19 was present at the covered property; (2) include allegations that COVID-19 materially altered all or part of the property; and (3) seek specific damages 'for replacing that property and only for the time that property was damaged or lost.'" (citation omitted)). Although these cases are nonbinding and applied different states' laws, we find no reason to conclude the Louisiana Supreme Court would interpret the policy differently.

Despite this unambiguous meaning, Q Clothier equates its losses to those in the Chinese drywall cases in which some Louisiana courts

determined the loss was a covered "physical loss" even in the absence of "physical damage." *See, e.g.*, *In re Chinese Man. Drywall Prods. Liab. Litig.*, 759 F. Supp. 2d 822, 831–32 (E.D. La. 2010). In those cases, courts determined the drywall was a "physical loss" even though it was intact and undamaged. *See, e.g.*, *Ross*, 70 So. 3d at 952. Importantly, the drywall still had to be removed and replaced in the property. *See id.* The courts also noted the drywall made the property unusable or uninhabitable due to the emission of sulfur gases. *See In re Chinese Man. Drywall Prods. Liab. Litig.*, 759 F. Supp. 2d at 832. One court determined the drywall, although not damaged, constituted a "distinct, demonstrable, physical alteration" of the insureds' property. *See id.* at 831.

The losses in those cases are distinguishable from Q Clothier's claimed losses here. Unlike the drywall cases, Q Clothier has not alleged that any property needs to be removed or replaced due to COVID-19's presence in its stores. Nor has it alleged that its property was unusable or uninhabitable because of COVID-19. Rather, the pandemic caused civil authorities to proclaim it unsafe for *people* to gather indoors including in stores like Q Clothier's. But COVID-19 itself did not make Q Clothier's stores inherently dangerous or uninhabitable like the drywall. Q Clothier's reliance on the drywall cases is therefore misplaced.

Because we conclude the plain and ordinary meaning of "physical loss of or damage to property" is a tangible alteration to, injury to, or deprivation of property, Q Clothier's claimed losses do not qualify for coverage under the policy's general coverage, Business Income Extension, or Limited Virus Coverage.

## B. Civil Authority Extension

The Civil Authority Extension does not cover Q Clothier's losses either. Although the civil authority orders directed Q Clothier to close its

No. 21-30278

stores, Q Clothier has not plausibly alleged they were issued as a "direct result of" a covered cause of loss to property in the immediate area of its stores.

The Civil Authority Extension applies "to the actual loss of Business Income [Q Clothier] sustain[s] when access to [the] 'scheduled premises' is specifically prohibited by order of a civil authority as the *direct result of* a Covered Cause of Loss to property in the immediate area of [the] 'scheduled premises.'" (emphasis added). In interpreting a similar civil authority provision, we concluded the provision requires a nexus between the civil authority order and property damage or losses near the insured premises. *See Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 686 (5th Cir. 2011) (interpreting provision using "due to" as requiring a nexus under Louisiana law). So too here, the phrase "direct result of" requires Q Clothier to plausibly allege some causal relationship between the "order of a civil authority," i.e., the Governor and Mayor's orders, and damage or loss to property near Q Clothier's stores.

Although Q Clothier alleges the civil authority orders were issued because of damage or covered losses to property near Q Clothier's stores, that allegation is implausible. The Governor's orders, for example, cited the need to mitigate the spread and impact of COVID-19 in the state. Insofar as there was a possibility of physical contamination of properties in the state, the orders called for preventative measures to avoid damage and contamination from COVID-19. The civil authority orders were a "direct result of" "the global pandemic and the need to take measures to contain and prevent the spread of COVID-19." *Terry Black's*, 22 F.4th at 458–59. There is no plausible nexus between the orders and any loss to property nearby

12

No. 21-30278

Q Clothier's stores.[4] *Cf. Dickie Brennan & Co.*, 636 F.3d at 686 (noting that a closure that occurs before damage occurs, based on fear of damage and not prior damage, does not establish the necessary causal link for civil authority coverage); *S. Tex. Med. Clinics, P.A. v. CNA Fin. Corp.*, No. 06-4041, 2008 WL 450012, at *10 (S.D. Tex. Feb. 15, 2008) (concluding there was no civil authority coverage when order was issued based on an "anticipated threat of damage" not actual damage to nearby property).

The coverage in the Civil Authority Extension requires a causal connection between loss or damage to property near Q Clothier's stores and the civil authority orders prohibiting access to its stores. Q Clothier has failed to plausibly allege that causal connection.

## C. Limited Virus and Time Element Coverage

Q Clothier's final argument is that its losses fall within subsection (B)(1)(f), the Time Element Coverage within the Limited Virus Coverage.[5] As an initial matter, the Limited Virus Coverage does not cover Q Clothier's

---

[4] Q Clothier only cites to the orders from the Governor of Louisiana and the Mayor of New Orleans. Those orders only discuss measures to be taken in the state and city. They make no mention of any location outside of the state. Most of Q Clothier's insured stores, however, are located outside of the state of Louisiana. To the extent Q Clothier argues the orders were issued as a result of damage to nearby property of the stores located in other states, we conclude that allegation is implausible simply because the stores are located outside of Louisiana.

[5] The Limited Virus Coverage is an exception to the Virus Exclusion which explicitly excludes from coverage losses that are caused by a virus. Q Clothier does not attempt to avoid the applicability of the Virus Exclusion. Nor could it in light of its unambiguous exclusion of the losses claimed here. *See Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 893–94 (9th Cir. 2021) (holding, under California law, the virus exclusion applied because COVID-19 was the "efficient cause" of its losses even though government orders directed business closures). But Q Clothier argues that its losses fall into the exception to the Exclusion. So, although we conclude the Virus Exclusion unambiguously applies, we must nonetheless address the exception here.

No. 21-30278

losses because it requires physical loss or damage to property. But even if Q Clothier did allege physical loss or damage, the Limited Virus Coverage "only applies" when the virus is the result of a (1) specified cause of loss, or (2) equipment breakdown. Q Clothier has not alleged one of the enumerated specified causes of loss listed in the policy, nor has it alleged an equipment breakdown. The Limited Virus Coverage therefore does not apply at all.

Q Clothier nevertheless argues subsection (B)(1)(f) creates an independent basis for coverage. That subsection, located in Limited Virus Coverage, states:

> The following applies *only if* a Time Element Coverage applies to the "scheduled premises" and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Time Element Coverage.
>
> > (1) If the loss which resulted in . . . virus does not in itself necessitate a suspension of 'operations,' but such suspension is necessary due to loss or damage to property caused by . . . virus, then our payment under the Time Element Coverage is limited to the amount of loss and expense sustained in a period of not more than 30 days unless another number of days is indicated in the Declarations.

(emphasis added). Focusing only on the second clause of subsection (1), Q Clothier argues it is covered because it suspended its operations due to a loss caused by the COVID-19 virus. Despite Q Clothier's novel argument, we discern no such reading of this subsection to provide coverage here.

The subsection does offer some limited coverage. In order to get it, a couple of things must happen. First, a loss causes a virus. That first loss does not require a suspension of operations. Second, the virus (that was caused by

the first loss) causes a different loss. That second loss *does* require a suspension of operations. Third, and finally, the payment for the suspension of operations caused by the loss from the virus, will be limited to 30 days.

Q Clothier does not allege that it suffered a loss that caused a virus, and that the virus in turn caused a loss which then led to the suspension of its operations. In fact, Q Clothier makes clear that its loss *is* the suspension of its operations. Regardless, a suspension of its operations first requires a physical loss of or damage to property. And as we have already concluded, that is absent here.

Q Clothier's argument also fails to recognize that subsection (B)(1)(f) is triggered by the first statement in the subsection: "[t]he following applies *only if* a Time Element Coverage applies." (emphasis added). This sentence requires the insured to show first that a "Time Element Coverage" applies. Although the policy does not define "Time Element Coverage," Q Clothier acknowledges that it is a term of art for coverages in which the measurement of loss is tied to a period of time, i.e., business interruption coverage.

Q Clothier does not allege that a "Time Element Coverage" applies at all. It only argues that its insurance has a time element in the general policy provisions and stretch coverage. In this policy, the applicable Time Element Coverage is the Business Income Extension. And because the Business Income Extension does not provide coverage here, subsection (B)(1)(f) is not triggered either.

## IV.   CONCLUSION

Consistent with our decision in *Terry Black's*, and the decisions of the unanimous circuit courts, we conclude, pursuant to Louisiana law, that losses caused by civil authority orders closing nonessential businesses in response to the COVID-19 pandemic do not fall within the meaning of "direct physical loss of or damage to property." And because Q Clothier has not plausibly

No. 21-30278

alleged that any other policy provision applies, its losses from the close of its stores are not covered by the policy. We accordingly AFFIRM.